# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**JIM LEMON et al.,**               )
                                    )
            **Plaintiffs,**         )
                                    )
        **v.**                      )        **Civil Action No. 05-949 (RCL)**
                                    )
**THE HONORABLE JOHN MCHUGH,**      )
**SECRETARY OF THE ARMY et al.,**   )
                                    )
            **Defendants.**         )
_____)

## MEMORANDUM OPINION

Upon consideration of defendants' Motions for Summary Judgment [66, 67, 68], plaintiffs' Motion for Summary Judgment [69], plaintiffs' Statement of Points and Authorities [70], defendants' Replies [71, 72, 74], plaintiffs' Reply [75], the applicable law, and the Administrative Record [77-1 to -6] herein, the Court finds that the federal defendants failed to make a convincing case that no Supplemental Environmental Impact Statement ("SEIS") was needed. However, plaintiffs' requested relief is not appropriate at this time. Therefore, defendants' Motions for Summary Judgment will be denied in part and granted in part, and plaintiffs' Motion for Summary Judgment will be denied.


**I. Background**

Plaintiffs Jim Lemon and Robin Biser filed a complaint alleging that the Army and private defendants did not comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, with respect to a redevelopment plan for a decommissioned Army base. (Compl. [1] at 20–21.)  In September 1998, the Army

closed Fort Ritchie, an Army post in Washington County, Maryland. Prior to closure of a military post, the Defense Base Closure and Realignment Act ("BRAC") requires the Secretary of Defense to consult with state and local governments concerning any plan for reuse of the property by the local community. *See* 10 U.S.C. § 2687 note (§ 2905(b)(2)(D)).  Washington County established a Local Redevelopment Authority ("LRA") (Admin. R. at 00007–09), which created a Comprehensive Redevelopment Plan for the property with input from the local government and community. (*Id.* at 00011–54.) In April 1997, Washington County approved the Comprehensive Redevelopment Plan for the reuse of Fort Ritchie. (Def.'s Mot. for Summ. J. [68] at 5.)

The Army evaluated the planned reuse of Fort Ritchie in a Draft Environmental Impact Statement ("DEIS"). The Army extrapolated from the Comprehensive Redevelopment Plan to determine three likely development scenarios, or "Reuse Alternatives" (Low Reuse Alternative, Low-Medium Reuse Alternative, and Medium Reuse Alternative), which it evaluated in the DEIS.[1] (Admin. R. at 00336–00506.) The Comprehensive Redevelopment Plan most closely resembled the Low-Medium Reuse Alternative. (*Id.* at 00393.) The Low Reuse Alternative and Medium Reuse Alternative assumed lower and higher amounts, respectively, of building reuse, building construction, employment, and housing availability than the Low-Medium Alternative. (*Id.*) These amounts were reflected in the form of raw numbers. (*Id.*) After receiving public comments on the DEIS, the Army issued a Final Environmental Impact Statement ("FEIS") in May 1998. (*Id.*  at 00792–00874.) The Court refers to the DEIS and FEIS collectively as the "EIS."

---

[1] The Army decided not to consider two other scenarios—High and Medium-High intensity—because they were unlikely to occur. (Admin. R. at 00867.)

Under the Army's methodology, any plan could be placed into a "land use intensity level," which is different from the Reuse Alternatives described above.[2] The intensity levels represent a "continuum" of activity levels on a given piece of land. (*Id.* at 00388.) At the low end of the continuum would be "uses not requiring substantial building or infrastructure improvements (e.g., open space, parks, conservation districts, etc.)." (*Id.*) At the high end would be "uses requiring substantial infrastructure (heavy manufacturing and industrial facilities, etc.)." (*Id.*) The Army exercised its own judgment to decide how to evaluate land use intensity. (*Id.*)  "No national standards exist to describe what constitutes low-, medium-, and high-intensity land use, and land use intensity standards used by land use planners vary considerably." (*Id.*) Upon evaluation of various types of indicators, the Army selected five representative intensity parameters: residential density, employee density (general spaces), employee density (warehouse spaces)[3], floor area ratio, and development ratio.[4] (*Id.*) "The intensity parameters should be considered together in evaluating the intensity of reuse of a site so as to provide full context. Use of any single parameter in isolation may unduly emphasize certain aspects of a site or preclude broader consideration." (*Id.* at 00390.) Each Reuse Alternative was

---

[2] Although the Army sometimes conflates the Reuse Alternatives and the generalized intensity levels (*see* Admin. R. at 00388), it treats them practically as separate concepts. This is demonstrated by how the Army describes them quantitatively. The intensity levels are determined using *ranges* of raw numbers across five parameters (*id.* at 00389), but the Reuse Alternatives are assigned *specific* raw numbers. (*Id.* at 00393.)

[3] It appears there is no warehouse space at Fort Ritchie, nor is any warehouse space planned in any of the Reuse Alternatives or the COPT plan. (Admin. R. at 01226.) Because this factor appears to be irrelevant, it is excluded from any further discussions of the Army's methodology.

[4] Residential density "identifies the number of dwelling units per acre." (Admin. R. at 01226.) Employee density (general spaces) "indicates the number of square feet available per employee in all types of facilities at an installation except family housing and warehouses or storage structures." (*Id.*) Floor area ratio "reflects how much development occurs at a site or across an area." (*Id.*) Development Ratio "is based on the amount of developed property in relation to the total amount of the property subject to land use planning at a given location." (*Id.*)

placed into one of these intensity levels and named accordingly (i.e., the Low-Medium

Reuse Alternative falls into the low-medium intensity level). (*Id.* at 00389–93.)

The Maryland General Assembly created the PenMar Development Corporation

("PenMar") to help implement the Comprehensive Redevelopment Plan, and in June

1997, the Army recognized PenMar as the LRA for the site. (*Id.* at 00317–30, 00334.) In

2004, Corporate Office Properties Trust ("COPT"), a development company, developed a

new plan: the Master Plan for Redevelopment of Fort Ritchie ("COPT plan"). (*Id.* at

01067–01179.) PenMar approved the COPT plan in 2004. (*Id.* at 01230.)

The Army issued its FEIS in 1998, six years before PenMar approved the COPT

plan. (*Id.* at 00792, 01230; Def.'s Mot. for Summ. J. [68] at 7.) Upon issuance of the

COPT plan and its approval by the Department of Housing and Urban Development in

October 2005, the Army prepared a Record of Environmental Consideration ("REC"),

which it issued in January 2006. (Admin. R. at 01223–28.) The REC concluded that the

COPT plan presented "no significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impact" and that "no

additional analysis under the National Environmental Policy Act (NEPA) [i.e., no SEIS]

[was] required." (*Id.* at 01224.) In October 2006, the Army transferred part of Fort

Ritchie to PenMar, which immediately transferred it to COPT. (Def.'s Mot. for Summ. J.

[68] at 8.) In November 2007, the Army transferred the remainder of the property to

PenMar, which transferred it to COPT. (*Id.*)

In May 2005, the plaintiffs filed suit, alleging that the COPT plan gave rise to

violations of the BRAC, NEPA, and National Historic Preservation Act ("NHPA"). In

August 2006, this Court dismissed all three counts of the plaintiffs' Second Amended

Complaint based solely on the issue of standing. *See Lemon v. Harvey*, 448 F. Supp. 2d 97, 106 (D.D.C. 2006). Plaintiffs appealed the ruling with respect to their claims under the NEPA and NHPA. (Pls.' Statement of P. & A. [70] at 11.) The Court of Appeals reversed, and the current action is on remand from that decision. *See Lemon v. Geren*, 514 F.3d 1312, 1316 (D.C. Cir. 2008). Plaintiffs voluntarily dismissed their NHPA claim in October 2008. (Pls.' Statement of P. & A. [70] at 11.) The only remaining issues are whether defendants violated the NEPA and whether the Army must issue a SEIS.

The Army moved for summary judgment, arguing that it was not required to issue a SEIS because it already evaluated possible environmental impacts of the COPT plan in the EIS. (Def.'s Reply [71] at 3.) It also argues that the REC adequately demonstrates that the COPT plan's environmental impacts were analyzed in the EIS. (Def.'s Mot. for Summ. J. [68] at 17.)

Plaintiffs filed an opposition to defendants' motions and also moved for summary judgment. They claim that the NEPA required the Army to supplement its EIS in light of the COPT plan and changed circumstances, and that it failed to do so. (Pls.' Statement of P. & A. [70] at 12.) Plaintiffs make four arguments in support of their Motion for Summary Judgment. First, plaintiffs allege that the COPT plan represents a substantially higher development intensity level than contemplated by the Reuse Alternatives examined in the EIS. (*Id.* at 13–16.) Second, they claim that the COPT plan imposes significant new impacts on Fort Ritchie's historic district, which the Army failed to evaluate. (*Id.* at 16–17.) Third, they claim that Washington County's non-attainment status for particulate matter under the Clean Air Act is a significant new circumstance requiring supplementation of the EIS. (*Id.* at 17–18.) Finally, they allege that the COPT

plan creates significant new impacts from an increase in impervious surfaces and the transfer of the base's water system to a private entity. (*Id.* at 18–20.)

## II. Legal Standard

Plaintiffs are challenging the Army's decision not to issue a SEIS, which is a final agency action. The Administrative Procedures Act ("APA") provides for judicial review of final agency action. 5 U.S.C. §§ 702, 704. Summary judgment is normally appropriate where there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "In a case involving review of a final agency action under the [APA], however . . . it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 81–82 (D.D.C. 2007) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)) (internal citation omitted).

The Court must review the Army's decision not to issue a SEIS for "agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375–76 (1989). Under this standard, the Court must engage in a "thorough, probing, in-depth review" of the administrative record to determine whether the Army's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 416 (1971).

Under the law of this Circuit, an agency has additional burdens of persuasion in the particular context of NEPA review: the agency must (1) accurately identify the relevant environmental concern; (2) take a "hard look" at the problem in preparing the REC; (3) make a "convincing case" that the potential environmental impact is not significant enough to require a SEIS; and (4) show that "even if there is an impact of true significance, [a SEIS] is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum."[5] *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008) (citing *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006)). The Court reviews the administrative record only to determine whether the Army "followed the necessary procedural requirements." *Overton Park*, 401 U.S. at 417. Even if this Court disagrees with the Army's decisions and conclusions, it may not substitute the agency's judgment with its own. *Id.* at 416.

Under the NEPA, an agency must issue a SEIS if (1) "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or (2) "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1); 32 C.F.R. § 651.5(g)(2) (implementing NEPA regulations as applied to action by the Army). Under the second prong of this regulation, a SEIS is required where "new information 'provides a *seriously* different picture of the environmental landscape.'" *City of Olmstead Falls, OH v. Fed. Aviation Admin.*, 292 F.3d 261, 274 (D.C. Cir. 2002) (quoting

---

[5] The additional requirement to make a "convincing case" differs somewhat from the requirements of *Overton Park*. The Court of Appeals determined that this additional requirement is appropriate in the context of the NEPA: "This burden should rest on the Government, both because of the high value placed on the protection of the environment by the National Environmental Policy Act of 1969, and because of the risk of error which results from not writing an impact statement on a project requiring one." *Md.-Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1040 n.10 (D.C. Cir. 1973) (citing *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615 (D.C. Cir. 1973)).

*Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984)). The Supreme Court

interprets the NEPA to mean that "[i]f there remains 'major Federal actio[n]' to occur,

and if the new information is sufficient to show that the remaining action will 'affec[t]

the quality of the human environment' in a significant manner or to a significant extent

not already considered, a supplemental EIS must be prepared." *Marsh*, 490 U.S. at 374

(quoting 42 U.S.C. § 4332(2)(C)). Determining how "significant" new information is

requires consideration of "context"[6] and "intensity."[7] *Marsh*, 490 U.S. at 374 n.20 (citing

40 C.F.R. § 1508.27).

     If the Army's "hard look" at any changes to the development plan, new

circumstances, or new information indicates that no SEIS is required, it may instead issue

---

[6] "[Context] means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant." 40 C.F.R. § 1508.27(a).

[7] "[Intensity] refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:
(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b).

a REC. 32 C.F.R. § 651.5(g)(2). "A REC briefly describes the proposed action and timeframe, identifies the proponent and approving official(s), and clearly shows how an action . . . is already covered in an existing . . . EIS." 32 C.F.R. § 651.19.

Thus, if review of the administrative record plainly shows that the Army ignored "substantial changes" to the development plan, "significant new circumstances," or "significant new information," or if the Army considered relevant factors but failed to make a "convincing case" that no SEIS was required, the Court must enter judgment for the plaintiffs. But if the record shows that the Army took a "hard look" at these factors and convincingly concluded that no SEIS was required, the defendants must prevail.

### III. Discussion

The Army argues that it took a "hard look" at the COPT plan and determined in the REC that any environmental impacts from this plan had already been evaluated in the EIS. (Def.'s Mot. for Summ. J. [68] at 15, 17.) The Army claims that the EIS evaluated the impacts of *any* plan that fell into the low, low-medium, or medium intensity levels, and because the REC demonstrates that the COPT plan fell into the medium intensity level, the Army is not required to issues a SEIS. (Def.'s Reply [71] at 6.)

Plaintiffs claim that four factors required the Army to issue a SEIS in light of the COPT plan. First, they dispute the Army's claim that it evaluated "any" development plan that fell within one of the low to medium intensity levels. They argue that the EIS only evaluated three specific Reuse Alternatives and that the COPT Plan represents a substantially greater development intensity than contemplated in any of these scenarios. (Pls.' Reply [76] at 2–3.) Second, they argue that the COPT Plan will result in significant

impacts on the Fort Ritchie historic district, which the Army failed to consider. *See* 40 C.F.R. § 1508.27(b)(3), (8) (agency should consider "proximity to historic or cultural resources" and possible adverse effects on sites "listed in or eligible for listing in the National Register of Historic Places" or on "significant . . . cultural[] or historical resources"); (Admin. R. at 00444 (describing elements of the historic district)). Third, they claim that Washington County's transition to non-attainment status for particulate matter under the Clean Air Act (Admin. R. at 01228) is a "significant new circumstance," and that the Army failed to explain adequately why the adverse air impacts did not require further analysis. Finally, they argue that the increase in impervious surfaces and the transfer of Fort Ritchie's water system to a private entity under the COPT Plan constitute "substantial project changes" that require examination in a SEIS. The Court addresses each claim in turn.

### a. Greater Development Intensity

Plaintiffs argue that the Army should have issued a SEIS because "the COPT plan's increased intensity of development will result in significant environmental impacts" over and above the impacts of the Reuse Alternatives examined in the EIS. (Pls.' Statement of P. & A. [70] at 13.) The Army argues that plaintiffs misunderstand its methodology, which it claims evaluated the impacts of *any* plan falling within any of the three land use intensity levels. The Court finds the Army's argument unpersuasive.

The Army states that it did not evaluate the impacts of any specific development plan, but rather assessed the raw numbers of three plans then under consideration (the Reuse Alternatives) to place them within general "intensity levels." (Def.'s Reply [71] at

5.) It then determined the potential range of impacts that would arise under each intensity level. (*Id.*) The Army argues that, because the COPT plan's land use intensity parameters cause the plan to fall within one of the intensity levels it already examined, it need not make any further conclusions about the COPT plan's potential impacts.

If the Army were in fact following the methodology described, the Court would have to defer to its conclusions. It appears, however, that the Army did not evaluate the impacts of generalized intensity levels, but rather examined specific raw numbers associated with the three Reuse Alternatives. Further, its conclusions about environmental impacts appear to depend on these raw numbers. The Court does not see how the Army could have looked at the potential range of impacts when its conclusions depend on figures specific to each plan.  Because the REC does not adequately explain this discrepancy, the Court cannot accept the Army's conclusion that the COPT plan will have no additional impact. Due to the complexity of this case, the Court's conclusions about the Army's methodology require some explanation.

*1. The Army's Methodology*

Contrary to its own statements, the Army does not look at a range of potential impacts under each generalized land use intensity level, but rather draws conclusions about environmental impacts from raw numbers associated with specific Reuse Alternatives. The Court concludes that the Army examined the Reuse Alternatives instead of the intensity levels in part because the Army states as much in the DEIS:

> This EIS analyzes reuse of Fort Ritchie, which is expected to occur. The nature of the reuse cannot be identified precisely. The Army considers the LRA's redevelopment plan the primary factor in defining the reuse

scenarios to be considered and evaluates *that reuse plan* for potential environmental effects. (Admin. R. at 00387 (emphasis added).)

Additionally, the Army's evaluation of environmental impacts appears to rely on the specific raw numbers associated with the Reuse Alternatives and not on the ranges of numbers associated with the intensity levels. The discussion of impacts on air quality under the Medium Reuse Alternative, for example, estimates emissions using that Alternative's estimate for the specific number of employee commuter trips, construction vehicle trips, and gallons of paint used.[8] (*Id.* at 00488–89.) The EIS presents conclusions about the Medium Reuse Alternative's environmental impacts based on the emissions estimated using these specific numbers. (*Id.* at 00487.) The EIS also relies on specific raw numbers for its evaluation of soils (*id.* at 00491), water resources (*id.* at 00492), and infrastructure (*id.* at 00493). The REC, on the other hand, examines land use intensity parameters—residential density, employee density, floor area ratio, and development ratio—to place the COPT plan into the medium land use intensity level. From this placement into the medium intensity level, the Army concludes that the range of impacts in all areas of environmental concern will be the same under the COPT plan as under the Medium Reuse Alternative.

Thus, the Army's logic is as follows: the Medium Reuse Alternative will have X, Y, and Z impacts on the environment because of the specific amount of construction and number of employees envisioned under that Reuse Alternative. The Medium Reuse Alternative land use parameters cause it to fall into the medium land use intensity level.

---

[8] The number of employee commuter trips is itself estimated using the specific number of employees (3,162) envisioned under this Reuse Alternative. (Admin. R. at 00489.) The amount of paint used is estimated using the specific amount of new construction and building reuse under this Reuse Alternative. (*Id.* at 00488.)

The COPT plan also falls into the medium intensity level, therefore, the COPT plan will also have X, Y, and Z impacts on the environment. Although the Army examined the amount of construction and number of employees to determine environmental impacts of the Medium Reuse Alternative, it need not do so to determine the COPT plan's environmental impacts. Although the Court cannot tell the Army how to develop its methodology, it also cannot accept such a strained line of reasoning.

The Army cannot demonstrate NEPA compliance merely by stating that it used a NEPA-compliant methodology. It must actually use that methodology. The Army argued that is was examining the potential range of impacts associated with each intensity level, but from all appearances it examined impacts associated with specific raw numbers, not ranges. The Army failed to demonstrate adequately that it determined the full range of impacts within a given intensity level, therefore the Court cannot accept the Army's argument that its methodology complied with the NEPA.

*2. Inadequacy of the REC*

Under the NEPA, the Army must take a "hard look" at any changes to the development plan, new circumstances, or new information. *See Marsh*, 490 U.S. at 374, 385; 32 C.F.R. § 651.5(g)(2). If this hard look indicates that no SEIS is required, the Army may instead issue a REC. 32 C.F.R. § 651.5(g)(2). The REC must "clearly show[] how an action . . . is already covered in an existing . . . EIS." *Id.* § 651.19. The Court cannot understand how the REC in this case "clearly showed" how the COPT plan was already covered in the EIS when the EIS did not cover the potential range of impacts under the medium land use intensity level. The REC examines residential density, square

feet per employee, floor area ratio, and development ratio. These parameters may be useful in determining some impacts, but the Army does not explain nor is it anywhere evident how they are adequate to determine all impacts presented in the REC. (Admin. R. at 01227.) The Army itself used other factors, such as the number of employees or amount of impervious area, to determine environmental impacts on air quality, soils, water resources, and infrastructure.[9] (*Id.* at 00487–89, 00491–94.)  The REC does not show even a cursory attempt to make light of these factors or to demonstrate how they produce the same conclusions as the EIS. The Court decides, therefore, that even if the Army did take the requisite "hard look" at the COPT plan, it did not adequately explain itself in the REC.

*3. Conclusion*

In sum, when deciding whether to issue a SEIS, the Army has the discretion to determine how it will come to conclusions about environmental impact, but it must ensure it adheres to the requirements of the NEPA in doing so. In this case, it must take a "hard look" to determine if a new proposed action presents changes, new circumstances, or new information beyond what has already been examined in an EIS. *See Marsh*, 490 U.S. at 374, 385. Second, if the Army determines it need not supplement the EIS, it must "clearly show" that it took a hard look and that the existing EIS already accounts for any purported changes, new circumstances or new information in the new proposed action. 32 C.F.R. § 651.19. In the EIS, the Army came to conclusions about environmental impacts

---

[9] Although one might argue that the REC addressed the total number of employees by using employee density as a proxy, the Army did not attempt, as it did for the Reuse Alternatives, to show the link between the COPT plan's employee figures and its impacts on air quality. It is therefore unclear why the impacts on air quality would be the same under the COPT plan and the Medium Reuse Alternative.

using raw numbers associated with specific Reuse Alternatives. In the REC, the Army

failed to examine the COPT plan's raw numbers and failed to make a convincing case

that those raw numbers were not factors that it should have examined in making a finding

of no significant impact. Before the COPT plan may proceed, the Army must issue either

a SEIS addressing significant impacts of the COPT plan or a new REC that makes a

convincing case why the COPT plan presents no significant impacts above and beyond

those determined in the EIS.


**b. Historic Area**

Plaintiffs claim that the COPT plan may impose significant impacts on Fort

Ritchie's historic district. (*Compare* Admin. R. at 00444–50 (describing and mapping

elements of historic district) *with id.* at 01174–79 (showing changes to historic district

under COPT plan).) The Court agrees and finds that the Army failed to make a

"convincing case" in the REC that the COPT plan would have no significant impact on

cultural resources. *See Mich. Gambling Opposition*, 525 F.3d at 29. Therefore, before the

defendants may proceed with the COPT plan, the Army must take the required "hard

look" at possible impacts on the historic district and address these impacts in either a

REC or a SEIS.

Under the NEPA, the Army must issue a SEIS if it makes substantial changes to a

project that are relevant to the environment or if significant new circumstances or

information relevant to the environment come to light. 40 C.F.R. § 1502.9(c)(1); 32

C.F.R. § 651.5(g)(2); *see also* 42 U.S.C. § 4332. In the context of the NEPA,

"significantly" refers to, *inter alia*, the severity of the project's impact on historic or

cultural resources and the extent to which the project may cause the loss or destruction of these resources. 40 C.F.R. § 1508.27(b)(3), (8). If the Army takes the requisite "hard look" at the project changes, new circumstances, or new information and determines that "previous analyses and documentation" are adequate to address them and that no supplemental documentation is required, it must state as much in a REC. 32 C.F.R. § 651.5(g)(2). In order not to issue a SEIS, the Army must either make a "convincing case" that the project changes or new circumstances will create no significant environmental impact, or, if it finds there will be significant impact, show that "changes or safeguards in the project sufficiently reduce the impact to a minimum." *Mich. Gambling Opposition*, 525 F.3d at 29.

Here, even if the Army took a "hard look" at project changes inherent in the COPT plan, the Court finds that the Army failed to make a convincing case in the REC that no supplemental documentation was required to address possible adverse effects on Fort Ritchie's historic district. First, in the REC, the Army fails to consider factors relevant to possible impacts on Fort Ritchie's historical and cultural resources. Second, the COPT plan makes major changes beyond those envisioned in the Comprehensive Reuse Plan and Reuse Alternatives, but the Army fails to address these changes in the REC. Finally, in light of these major changes, the Army should have outlined mitigation measures, but failed to do so.

The Army did not examine factors relevant to historical or cultural resources in the REC. Although the REC went into great detail in analyzing the COPT plan's land use intensity parameters (Admin. R. at 01225–27), it is not at all apparent to the Court how these land use parameters have any bearing on historical resources. The DEIS confirms

this view. The DEIS's discussion of impacts on historical resources under the Medium

Reuse Alternative does not reference any of the land use intensity parameters. (*Id.* at

00498.) Instead, the DEIS analyzed the amount of new construction, demolition, and

reuse of existing structures. This discussion in the DEIS made specific reference to the

raw numbers associated with the Medium Intensity Reuse Alternative, indicating that an

examination of the generalized impacts associated with the medium land use intensity

level would be inadequate to address effects on historical resources. In the REC, the

Army should have either made specific mention of these raw numbers, which it

apparently considered relevant factors in drawing conclusions in the EIS, or it should

have explained why reference to the raw numbers of the COPT plan was unnecessary to

make a finding of no significant impact.

Furthermore, the COPT plan makes major and obvious changes to Fort Ritchie's

historic district, none of which are addressed in the REC. The Army failed to make a

"convincing case" that these changes were not significant or that changes in the project

were sufficient to mitigate the effects of these changes. In particular, the COPT plan

contemplates the construction of buildings and sports facilities on the historic parade

ground. (*See id.* at 01174–79.) Examination of the administrative record strongly implies

that building on the parade ground was not envisioned under any of the Reuse

Alternatives examined in the EIS. The Comprehensive Redevelopment Plan on which the

Reuse Alternatives were based assumed that the parade ground would essentially remain

untouched, being "integrated into any new development scenario as a green open space."

(*Id.* at 00054.) The Army should have addressed these blatant divergences from the

original Reuse Alternatives and their impacts on Fort Ritchie's historical resources. At a

bare minimum, it should have explained in the REC whether and how it would take steps to mitigate these effects.

The Army argues that it has taken steps to mitigate any negative effects that the COPT plan may have on Fort Ritchie's historic district, primarily through institution of a Programmatic Agreement to reduce impacts on historical resources. (*See* Def.'s Reply [71] at 7–11.) This may be true, but the Army did not adequately outline these measures as they would apply to the COPT plan, as required by 32 C.F.R. § 651.5(g)(2) and this Circuit's precedent. *See Mich. Gambling Opposition*, 525 F.3d at 29; (Admin. R. at 01223–28). Although the Army states in its court filings that the Programmatic Agreement will avoid or mitigate adverse effects to the historic district (Def.'s Reply [71] at 8–11), it failed to establish this in the REC. Although the REC mentions the Programmatic Agreement as part of its section on "Background" (Admin. R. at 01223), it is clear that the Programmatic Agreement's adequacy was evaluated only in relation to PenMar's Comprehensive Redevelopment Plan and not to the COPT plan. (*See id.* at 00506.) Therefore, the Army failed to evaluate the adequacy of mitigation efforts in the face of significant new circumstances or changes.

The Army also implies that its satisfaction of the NHPA's requirements is sufficient for purposes of the NEPA. (*See* Def.'s Reply [71] at 8–9.) The Court clarifies here that this is not the case. Although the NHPA and NEPA resemble each other in certain respects[10], compliance with the NHPA "does not relieve a federal agency of the duty of complying with the impact statement requirement 'to the fullest extent possible.'"

---

[10] "Both Acts create obligations that are chiefly procedural in nature; both have the goal of generating information about the impact of federal actions on the environment; and both require that the relevant federal agency carefully consider the information produced." *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982).

*Pres. Coal.*, 667 F.2d at 859 (quoting 42 U.S.C. § 4332). "To the fullest extent possible" in this case means that the Army should have either supplemented the EIS or documented in a REC its reasons for not issuing a SEIS. The Army did neither with respect to impacts on historic resources, and compliance with the NHPA does not alter this fact.

40 C.F.R. § 1502.9(c)(1) and 32 C.F.R. § 651.5(g)(2) are very clear that a finding of no significant impact must be documented in a SEIS or REC. If there will be an impact, an agency seeking to show that a SEIS is unnecessary must demonstrate that mitigation measures "sufficiently reduce the impact to a minimum." *Mich. Gambling Opposition*, 525 F.3d at 29. The Army failed to do either with respect to possible impacts of the COPT plan on Fort Ritchie's historic district. Therefore, the Army and the private defendants may not move forward with the COPT plan until the Army issues either a SEIS or REC that complies with these requirements under the NEPA.

### c. Washington County's Non-Attainment Status under the Clean Air Act

Due to the Court's holding that the COPT plan may not proceed unless and until the Army either issues a SEIS or a REC that adequately explains its decision not to supplement the FEIS or its determination that mitigation efforts will suffice, the non-attainment status issue is not ripe for review at this time. The Army will have to take another "hard look" to address whether the COPT plan presents changes significant enough to warrant a SEIS, therefore it will have another opportunity to determine whether Washington County's non-attainment status for particulate matter is a "significant new circumstance." If it is not a significant new circumstance, the Army will have the opportunity to make a "convincing case" demonstrating as much. If it is

significant, the Army may show that mitigation measures "sufficiently reduce the impact

to a minimum." *Mich. Gambling Opposition*, 525 F.3d at 29.


### d. Increased Impervious Surfaces

Similarly, plaintiffs' claim regarding increased impervious surfaces under the

COPT plan is also not ripe for review. Because the Army will, at the very least, have to

issue another REC to permit the COPT plan to proceed, it would be inappropriate to order

the Army to issue a SEIS to address this issue. The Army may well take a "hard look"

and find that an increase in impervious surfaces does not represent a "significant" change

necessitating a SEIS. If this turns out to be the case, the Army will have to make a

"convincing case" explaining the reasons for its finding.


### e. Transfer of Water System to a Private Entity

Finally, plaintiffs contend that the transfer of Fort Ritchie's water system to a

private entity will impact surrounding communities by increasing hook-up fees. (Pls.'

Statement of P. & A. [70] at 20.) This argument must fail. As the Army points out,

"[o]nly when socioeconomic effects somehow result from a project's environmental

impact must they be considered." (Def.'s Reply [71] at 14 (quoting *Hammond v. Norton*,

370 F. Supp. 2d 226, 243 (D.D.C. 2005)).) Plaintiffs' chain of causation does not

implicate environmental impacts; they state that the transfer of the water system itself

may directly cause significant economic impacts without environmental impacts playing

any sort of intermediate role. (*See* Pls.' Statement of P. & A. [70] at 20.) *Cf. Metro.*

*Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) (NEPA requires

"a reasonably close causal relationship between a change in the physical environment and the effect at issue"). Although the Army may determine subsequently that it should address environmental impacts of the transfer of Fort Ritchie's water system, it need not do so for the reason that plaintiffs advance.

## IV. Conclusion

For the foregoing reasons, the defendants' Motions for Summary Judgment [66, 67, 68] will be DENIED in part and GRANTED in part, and the plaintiffs' Motion for Summary Judgment [69] will be DENIED.

A separate order shall issue this date.

## <u>Date</u>

November 10, 2009.

_____/s/_____
ROYCE C. LAMBERTH
Chief Judge
United States District Court